**THOMAS P. SMITH, JR.**
**CO-ACTING REGIONAL DIRECTOR**
**Hane L. Kim**
**Shannon Keyes\***
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**100 Pearl Street, Suite 20-100**
**New York, New York 10004-2616**
**(212) 336-1088 (Kim)**
**kimha@sec.gov**
**Attorneys for Plaintiff**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>                              **Plaintiff,**<br><br>                    -against-<br><br>**FRANCISLEY VALDEVINO DA SILVA, RAMON ANTONIO PEREZ ARIAS, JUAN ANTONIO TACURI FAJARDO, AND JOSE RAMIRO CORONADO REYES,**<br><br>                              **Defendants.** | **COMPLAINT**<br><br>**22 Civ. 10534 (  )**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

Defendants Francisley Valdevino Da Silva ("Da Silva"), Ramon Antonio Perez Arias ("Perez"),

Juan Antonio Tacuri Fajardo ("Tacuri"), and Jose Ramiro Coronado Reyes ("Coronado")

(collectively, "Defendants"), alleges as follows:

## SUMMARY

1.      This is an international pyramid scheme case involving a fake crypto asset trading and mining company.  In approximately mid-2017, Brazilian national Da Silva, a self-proclaimed "boss of the pyramid scammers," concocted a pyramid scheme, Forcount Trader Systems, Inc. ("Forcount"), with the assistance of three U.S.-based sellers, or "promoters" of the scheme, Tacuri, Perez and Coronado.

2.      During various time periods within approximately July 2017 to at least November 2020, Defendants (1) raised funds from retail investors in Spanish-speaking communities in the United States, and several other countries, through the unregistered offer and sale of securities styled as membership interests in Forcount; and (2) knowingly or recklessly engaged in a scheme to defraud numerous investors—bilking the investors out of over $8.4 million—by enticing them with the promise of guaranteed, astronomical daily returns from investments in securities.

3.      Defendants sold sham "memberships" in Forcount as investments.  Defendants claimed that a membership in Forcount would give investors interests in returns generated from various crypto assets through Forcount's fake crypto asset trading and mining operations, accessible on Forcount's website.  Defendants claimed that investors would profit from two income streams: (1) sharing proceeds from Forcount's own crypto asset trading "calibrated robots" and a crypto asset "intelligent mining system" from which investors would receive guaranteed profits, and (2) Forcount's referral program, which gave investors the right to earn compensation for recruiting new investors into the scheme, such that an investor acted as a promoter and had layers of other promoters and investors below them (the "downline").

4.      The Forcount memberships were investment contracts and therefore securities, because investors made an investment of money in a common enterprise with a reasonable

expectation of profits from the efforts of Defendants or third parties.  Defendants offered and sold these securities without registering their offers or sales with the Commission or qualifying for an exemption from registration.

5.      Forcount was also a classic pyramid scheme.  Forcount did not sell any real product or service to retail customers.  Despite Defendants promises of returns based on Forcount's trading and mining, as well as the referral program, Forcount had no real source of revenue other than funds received from investors.  Defendants had no basis for the promised returns, and funds received from later investors were used to make Ponzi-type payments to earlier investors.

6.      Da Silva devised and controlled the vast majority of Forcount's operations, including the invention of Forcount's supposed business, the creation of a sham website that purported to reflect a crypto asset trading platform and investor accounts, the compensation plan for promoters and investors, the website infrastructure, and the distribution of payments to investors.

7.      Defendants took part in promoting Forcount to investors, including by planning and participating in promotions in which they knowingly or recklessly made materially false and misleading claims to investors concerning Forcount's operations, Forcount's success, and the success of investors in Forcount memberships.  For those investors, their success was substantially dependent on the efforts of Defendants to market Forcount and recruit investors.

8.      Defendants accelerated Forcount's inevitable collapse by misappropriating investor funds for personal use—including to purchase homes, dozens of cars, and luxury goods—and paying for lavish events and other methods of attracting additional investors.  By

late 2019, Forcount had been regularly restricting investor redemptions, and by late 2020, Forcount collapsed.

9.      Defendants defrauded hundreds of investors from at least 19 U.S. states and other countries.  From July 2017 through November 2020, investors sent more than $8.4 million to Forcount, mainly through cash transfers.  Defendants then misappropriated, collectively, at least $3.4 million in investor funds for their personal use.  By the time Forcount collapsed, investors were left with nothing.

## VIOLATIONS

10.     By virtue of the foregoing conduct and as alleged further herein, Defendants violated Sections 5(a), 5(c), 17(a) of the Securities Act of 1933 (Securities Act") [15 U.S.C. §§ 77e(a), 77e(c), 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

11.     Unless Defendants are restrained and enjoined, they will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

12.     The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

13.     The Commission seeks a final judgment: (a) permanently enjoining Defendants from violating the federal securities laws and rules this Complaint alleges they have violated; (b) permanently enjoining Defendants from directly or indirectly, including, but not limited to, through any entity owned or controlled by Defendants, offering, operating, or participating in

any marketing or sales program in which a participant is compensated or promised compensation solely or primarily for inducing another person to become a participant in the program, or if such induced person induces another to become a participant in the program; (c) permanently enjoining Defendants from participating, directly or indirectly, in any offering of any crypto asset security, provided, however, that such injunction shall not prevent them from purchasing or selling crypto asset securities for their own personal accounts; (d) ordering Defendants to disgorge their ill-gotten gains and to pay prejudgment interest thereon pursuant to Sections 21(d)(3), (5) and (7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), (5) and (7)]; (e) ordering the Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; (f) permanently prohibiting the Defendants from serving as officers or directors of any company that has a class of securities registered under Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports under Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)], pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)]; and (g) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

15.     Defendants, directly and indirectly, made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

16.     Venue lies in this District under Section 22(a) of the Securities Act [15 U.S.C. § 78v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within the Southern District of New York.  Through Forcount, Defendants communicated with and received funds from investors located in this District.

## **DEFENDANTS**

17.     Da Silva, age 37, is Brazilian national and resides primarily in Brazil.  Da Silva was Forcount's Chief Executive Officer ("CEO").  He developed the idea for and, at all relevant times, controlled Forcount, and received investor funds directly from investors and through Forcount.

18.     Perez, age 40, is a resident of Orlando, Florida.  Perez was a Forcount promoter from approximately October 2017 through late 2020, and received investor funds directly from Forcount investors and through Forcount.

19.     Tacuri, age 44, is a resident of Kissimmee, Florida.  Tacuri was a Forcount promoter from approximately October 2017 through November 2020, and received investor funds directly from Forcount investors and through Forcount.

20.     Coronado, age 34, is a resident of Orlando, Florida.  Coronado was a Forcount promoter from approximately October 2017 through January 2019, and received investor funds directly from Forcount investors and through Forcount.

## **FORCOUNT**

21.     Forcount is a Panamanian corporation, incorporated on or about February 19, 2018.  Forcount had no securities registered with the Commission.  Forcount purports to have existed since approximately 2015, but public records indicate Forcount's website did not exist

until July 2017.  Forcount claims to have been an international multi-level marketing ("MLM")

organization and to have operated a crypto asset trading platform and crypto asset mining

services.  In or about late 2017, Da Silva caused Forcount to issue its own token, MindExCoin

("MIC").  In 2019, Forcount was at least partially rebranded as Weltsys, a MIC-based supposed

MLM enterprise, which claimed to be a Hong Kong-based company but did not appear to be

organized in any jurisdiction or have any formal legal existence.[1]  Da Silva created, controlled,

and managed the day-to-day operations of Forcount.

## FACTS

### A.    DA SILVA CREATES FORCOUNT'S MEMBERSHIP OFFERING.

22.     In or about mid-2017, Da Silva created Forcount, following at least one other

failed crypto asset-based supposed MLM enterprise.  Da Silva developed the idea for Forcount,

created and controlled Forcount's website and its compensation plan, solicited promotors,

developed and participated in promotions, and directed his associates on Forcount's operations.

23.     Defendants offered and sold memberships in Forcount.  Investors would pay cash

(or occasionally crypto assets) to Forcount, which had a website that purported to host a crypto

asset trading platform and mining services, to acquire a membership in Forcount.  Da Silva or

those he controlled would create an account for the investor on Forcount's website, which would

reflect that the account "held" certain crypto assets.

24.     Initially, Forcount memberships involved purported interests in one or more

known crypto assets, with supposed returns paid in kind.  In or about January 2019, Da Silva

announced that all Forcount memberships were converting from all other crypto assets to

---

[1] "Forcount" is used in this complaint for Forcount Trader Systems, Inc. as well as the partially
re-branded entity "Weltsys."

Forcount's proprietary crypto asset token, MIC.

25.     Da Silva devised a structure in which investors would supposedly profit from two streams of income:  sharing proceeds from Forcount's purported efforts to trade and mine crypto assets, and receiving commissions and bonuses for selling additional memberships.  Forcount's website displayed fictitious returns based on the specified amounts and types of crypto assets that investors appeared to hold in their Forcount accounts.

26.     Investors in Forcount memberships could not withdraw their principal (the amount of the initial investment).  Instead, the memberships only gave investors an interest in the supposed *returns* on the principal, and no access to the principal amount invested.

27.     Moreover, investors had no right to the crypto assets allegedly in their account. Thus, investors had no ability to sell, trade, or transfer these supposed crypto assets anywhere outside of the Forcount website.

28.     Earlier in the scheme, investors could ask to "withdraw" the returns they had supposedly received and would receive either cash or some type of crypto asset; as Forcount headed towards collapse, investors' withdrawal requests were no longer honored.

29.     Da Silva, as the mastermind of Forcount, knew from the outset that the crypto assets that were supposedly in investors' Forcount accounts were fictitious and therefore had no value.  Perez, Tacuri, and Coronado each learned of the same as they began to promote Forcount, but knowingly or recklessly continued to promote it.

30.     Da Silva created Forcount's marketing materials, including a "Business Plan," which was an approximately 30-page PowerPoint document that evolved over the course of the scheme, but consistently contained descriptions of Forcount's "operations," as well as (a) the "returns" investors would receive from investing in Forcount memberships and (b) the

commissions and bonuses investors would receive for recruiting others to invest in memberships. Forcount promoters, including Perez, Tacuri, and Coronado, disseminated the Business Plan to investors and potential investors.

### 1.    Forcount's Alleged Trading and Mining

31.    According to its Business Plan, Forcount claimed to be an expert in crypto asset trading.  Forcount asserted that its crypto asset trading was "automated" and described it as a "key business line" and as its "oldest most profitable activity."  Forcount claimed that investments through Forcount would result in returns from "daily trade through our calibrated robots to generate daily earns!"  Forcount further touted its alleged trading platform, promising "access to the latest products in the cryptocurrency market."

32.    Forcount also claimed investors would receive returns from Forcount's use of "intelligent mining system" with "10,000 machines" that "automatically mine" such crypto assets.

33.    Forcount claimed to be a "100% decentralized system–All operations are performed through cryptocurrencies and their blockchains."

34.    Da Silva was initially responsible for Forcount's claims about its operations, and Defendants parroted these claims to investors and potential investors.

35.    According to its "Business Plan," Forcount promised "a positive result in a constant way, guaranteeing our users an increase in their investments."  Forcount specifically promised returns of 0.5% up to 3% *per business day*, or up to *780%* annual return, with larger returns promised to those who invested greater amounts.  For example, according to an investor from the Bronx, New York, who attended approximately six Forcount events starting in the fall of 2018 ("Investor A"), Tacuri told attendees that their investments would earn a return of at least 1.5% per day.

36.     When promoting Forcount memberships, promoters, including Perez, Tacuri, and Coronado, told investors that they could expect their investment to double in six to eight months.

37.     In or around October 2019, Forcount capped supposed annual returns at 200%.

### 2.     Compensation from Forcount's Referral Program

38.     Da Silva established a referral program so that investors would be rewarded for bringing in additional investors and forming a downline of investors.  Through the referral program, investors earned compensation by recruiting others to invest in Forcount memberships.

39.     The referral program compensation consisted of commissions and a complicated points-based bonus plan.  Investors who promoted Forcount memberships received commission and "points" for successfully recruiting new investors to Forcount and when their downline investors recruited new investors.

40.     Investors received, at a minimum, a 5% commission on the initial investment amount for anyone they persuaded to invest in Forcount.  Coronado and Tacuri showed the Business Plan to investors during promotional events, which reflected a commission structure of 1% to 20% for recruiting additional investors.  Coronado specifically told one investor to expect commissions as high as 20%.

41.     Investors could also receive points, which, like commissions, were given based on the size of an investor's downline.  The points were calculated on a monthly basis, and investors reached certain levels based on the points earned each month.  Defendants also told investors that, depending on the level, investors could receive bonuses ranging from $400 to $100,000 per month, or even a new car.

42.     Da Silva exercised complete control over compensation for the referral program.  It changed frequently at Da Silva's direction—with varying levels, bonuses, and prizes.  On multiple occasions, Da Silva blocked promoters from earning additional points or took away

10

points, and switched the crypto assets that points were purportedly earning.  Da Silva also regularly changed the payment structure, making it unpredictable.

43.     Defendants aggressively pushed investors to participate in the referral program and to solicit family and friends to invest.  Defendants promised investors that they would earn more from the referral program than they did from their membership "returns."  Defendants also presented or distributed the Business Plan, which promised investors greater returns the higher up an investor was in a recruitment chain based on commissions and bonuses.

44.     For example, Tacuri told investors that the referral program was a "fast start," which provided investors with an opportunity to double the rate of return.  Perez pushed Investor A to recruit investors for Forcount memberships, offering the investor crypto assets then valued at $1100.  Da Silva regularly announced referrals that could earn investors even more points and therefore higher bonuses, or prizes like international trips and luxury cars.

45.     Defendants' appeals to investors were effective, and many, in turn, convinced family and friends to invest in Forcount memberships.  Investor A, for example, said that he was convinced to invest after hearing claims about Forcount's success, and that after his investment was successful, he convinced four family members to invest as well.

46.     Investors who participated in the referral program generally received more in fictitious returns from commission and points than they earned from their alleged returns from Forcount's operations.

**B.     DA SILVA INVITES OTHER DEFENDANTS TO FORCOUNT.**

47.     Da Silva sought out experienced promoters to solicit investors, such as Perez, Tacuri, and Coronado, who had a track record of recruiting investors for similar apparent schemes.

11

48.     Around or about August 2017, Da Silva reached out to Coronado, who had previously invested in a different Da Silva-operated supposed MLM enterprise, and asked him to meet to discuss promoting Forcount.  Coronado was not able to meet Da Silva at the time, but Coronado asked Perez, who also had promoted similar schemes, to meet with Da Silva instead.

49.     After the meeting, Perez and Coronado decided to promote Forcount together as partners.  Until Coronado ceased promoting Forcount in 2019, Perez and Coronado operated as equal partners, they shared an account on Forcount's website and split the commissions and points they received from downline investors equally.

50.     Shortly thereafter, Da Silva and Perez invited experienced promoters to participate in the scheme.  Around October 2017, Da Silva and Perez travelled to Las Vegas, Nevada, to recruit additional, experienced promoters for Forcount at an MLM networking event, and successfully recruited other promoters, including Tacuri.

### C.     DEFENDANTS OFFERED AND SOLD FORCOUNT MEMBERSHIPS.

51.     Da Silva offered and sold Forcount memberships from approximately July 2017. Perez, Tacuri, and Coronado began to offer and sell the memberships from late 2017.  When Coronado left Forcount in early 2019, Da Silva, Tacuri, and Perez, continued to offer and sell memberships through at least November 2020.

52.     At Da Silva's direction, Perez, Tacuri, and Coronado solicited potential Forcount investors.  Perez, Tacuri, and Coronado targeted Spanish-speaking communities, first primarily in the Bronx, New York, and Florida, and later throughout the United States.

53.     Defendants made false statements when soliciting investors, primarily through video appeals and/or in-person or virtual events.  They also widely publicized Forcount's website, and anyone who accessed the site could invest in a Forcount membership.  Defendants

12

also broadly disseminated Forcount's Business Plan to any interested investors as a way to promote Forcount, either directly or through other promoters.

### 1.    Video Solicitation

54.    Da Silva directed the creation of highly stylized, professionally produced, promotional videos for Forcount.  Da Silva dictated the content and directed these videos to be posted on Forcount's website and social media sites like YouTube.  Tacuri and Coronado re-posted these videos on social media.  Defendants primarily used these videos to recruit investors and encourage additional investment, and the videos often created the false appearance that Forcount was a profitable, sophisticated entity.

55.    Some videos would showcase Forcount's in-person events.  Others would flaunt Da Silva's extravagant lifestyle—purportedly funded by his success in Forcount investments—showing him and his associates at fine dining establishments or celebrating at upscale venues.

56.    The videos created the false image that Forcount was a real, operating company. To create such image, Da Silva, who appeared relatively young, hired an older, more mature looking actor who lived in Spain, Individual 1.  In videos that Da Silva produced and distributed, Individual 1 portrayed a supposed high-level Forcount executive, "Salvador Molina."  However, in reality Individual 1 had no control over Forcount, and no relevant crypto asset expertise. Despite this, by mid-2018, Individual 1 regularly appeared in videos, discussing Forcount's success and promoting the company, repeating words from scripts that Da Silva provided.  The videos did not disclose that Individual 1 was actually an actor hired to play the fictitious "Salvador Molina," and Da Silva did not disclose this fact to potential investors.

57.    As early as January 2019, Da Silva falsely called "Salvador Molina" Forcount's CEO.

58.     In another video posted on YouTube on or about October 11, 2018, Tacuri promoted investing in Forcount and encouraged participation in the referral program, promising a "fast start," with a chance to double the rate of return.

59.     Da Silva also falsely presented the offices of a different company as Forcount's, even though Forcount had no offices of its own.  Specifically, one Forcount promoter, who travelled to Brazil on or about August 2019, told Coronado that he saw Forcount's supposed offices.  He reported to Coronado that the offices were "dressed up" to look like Forcount's office but were "fake."  (Translation, original in Spanish.)

60.     Da Silva created the content on Forcount's website for the other Defendants, as well as other promoters, to use in recruiting new investors.  Defendants widely disseminated the content, and encouraged others to share, to promote, and to recruit for Forcount.

### 2.      In-Person or Virtual Events

61.     Defendants regularly held or participated in in-person and virtual events to solicit investors in Forcount memberships, using investors' funds to pay for these events.

62.     Defendants planned presentations at Forcount events at hotel conference rooms throughout the United States throughout 2018 and at least early 2019.  These events included ones held in East Elmhurst, New York; New York, New York; Oxon Hill, Maryland; and Woburn, Massachusetts.  Da Silva also held international events.

63.     The hotel events were open to the public and heavily promoted on social media. Defendants did not restrict who could attend events or who could invest at or following the events.

64.     To attract potential investors to attend, Forcount would hold raffles and give away prizes, and cash.  For example, in late 2018, Tacuri gave a cash prize of $150 to Investor A for

repeating Tacuri's "rules" for investing in Forcount; "create a free account, invest, invite friends, double up, and repeat the process."

65.     Throughout 2018, Perez also frequently solicited downline investors one-on-one, or in small groups throughout the United States, including in Miami, Atlanta, New York, and Orlando as well as in in Cancun, Mexico on or about August 15, 2018.

66.     Beginning in or about March 2018 and continuing for several months, Coronado hosted virtual meetings generally five days per week to solicit investors in Forcount.  Coronado broadly promoted these virtual meetings on social media, and they were open to the general public.  These virtual meetings frequently had hundreds of attendees.

67.     At these in-person or virtual meetings, Defendants touted Forcount memberships, repeated false claims about Forcount's profitability and operations, encouraged participation in Forcount's referral program as a means of recruiting new investors, boasted about their own supposed success from investing and promoting Forcount, and presented false testimonials from downline promoters.

68.     In or about July 2018, Tacuri spoke at a Forcount event at a hotel in East Elmhurst, New York, with approximately 40 people in attendance, and Tacuri told investors at this event that they could double their money by investing in Forcount memberships, and that Forcount would trade on investors' behalf.

69.     At various events held in 2018, Tacuri, Perez, and Coronado each showed off borrowed, leased, or rented cars that they falsely claimed to have purchased with investment proceeds generated from their memberships, including from the referral program.

70.     Da Silva directed Perez, Tacuri, and Coronado to claim that they were more successful than they actually were.  For example, during 2018, Perez, Tacuri, and Coronado

15

referred to themselves as the "Black Diamond" level promoters.  According to Forcount's

Business Plan, to be at the "Black Diamond" level would have meant they brought in

approximately $100,000 in investor funds per month for three consecutive months and would

receive an additional $10,000 bonus each month.  Perez, Tacuri, and Coronado never brought in

this much, per month, in investor funds.

71.    By early 2019, Perez and Tacuri were claiming to be even more successful.  They

advertised two events held on February 25, 2019, at the East Elmhurst hotel and on February 27,

2019, at the hotel in Woburn, Massachusetts over a messaging service:

> Attention
>
> The moment has arrived, two years in the industry and we keep making history.
> You can't miss this event with the EXECUTIVE DIAMONDS Ramon Perez and
> Juan Tacuri with special guest [REDACTED] DIAMOND
>
> …they will teach how to duplicate your capital and benefit from your money.
> Don't let banks take advantage of your capital.
>
> We'll be expecting you, make the difference this year, be different and dare
> yourself…lose your fear, we're going for the MILLION."

(Translation, original in Spanish.)  According to Forcount's Business Plan, to be at the

"Executive Diamond" level would have meant that Perez and Tacuri brought in $150,000 in

investor funds per month for three consecutive months and would receive an additional $15,000

(by October 2019 it was $20,000) bonus each month.  Perez and Tacuri had never brought in this

much, per month, in investor funds.

72.    Defendants similarly claimed downline promoters were far more successful than

they actually were, in order to create the appearance of success, and invited these promoters to

provide testimonials that Defendants knew were false.

73.     For example, in or around mid-2018, Coronado and Perez asked one downline promoter ("Promoter 1") to provide a testimonial at an in-person event, and directed her to state she was making upwards of $20,000 per month.  From then on, Promoter 1 gave testimonials approximately every other month, and Coronado and Perez regularly introduced her as making over $20,000 per month.  Coronado and Perez knew these statements about Promoter 1 were false.

74.     Also, in late 2018, Coronado took a video of Promoter 1's home, and showed this video at promotional events, claiming that Promoter 1 had been able to purchase it with her Forcount compensation.  Coronado knew that Promoter 1 did not own the property and was renting the house and that these statements were false.

75.     As with the videos, Da Silva deceived investors at in-person and virtual events. For example, at a promotional event in Cancun, Mexico, in or around October 2019, Da Silva sold raffle tickets for a car.  When Da Silva was unable to sell enough raffle tickets, he decided to draw a fictitious number so that he could keep the proceeds.

76.     Da Silva also used Individual 1 to create, like Da Silva had with the videos, the false impression that Forcount was a successful company.  For example, in January 2019, Da Silva filmed a video for Individual 1, in which he directed Individual 1 to lead a virtual meeting for investors and potential investors as Forcount's CEO "Salvador Molina," and gave Individual 1 instructions on what to say:

> I want it to go something more or less like this.  He's going to talk about a lot of things, okay?  And then I'll tell you more or less what he's going to talk about and you'll improve the text, okay?  . . .  Just as if it were live. "Happy to be here with you today.  I would like to tell you that this year you will be seeing more of me.  I will be closer to you as CEO of Forcount."

And on this Zoom meeting today I want to tell you that the year basically starts today. . . .  We kick off with a new agenda where we will have a CEX in Jerusalem, in July.  We will have a CEX in Hong Kong, in April, we will have several additions in several... the company is going very strong in Asia as well.

Then you can talk about the promotions, okay?  About the packages that are going to be cheaper.  The value of the packages, so on, so on, the binary, blah, blah, blah, blah, blah. . . .  Every dash that you activate is worth 3 points for the Club, so you can grow…  And the big thing in the Benz Club is these promotions that we are going to do every month giving out prizes, giving out these prizes, all over the world. (Translation, original in Portuguese.)

77.    Promoters, including Perez, Tacuri, and Coronado, instructed investors to provide investments in cash, or to accounts either under Da Silva's control, or to accounts controlled by the promoter that had recruited them.  Investors at Forcount's events lined up to invest with cash in small dollar amounts.

78.    If investors wanted to pay by bank or wire transfer, at least two Defendants, Da Silva and Tacuri, instructed investors that if a bank asked any questions about the transaction, they should tell the bank that the transaction was for software and not crypto currency.

### 3.    Unregistered Offers and Sales

79.    Defendants' offers and sales of Forcount memberships were offers and sales of "investment contracts," and thus securities within the meaning of Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

80.    Investors purchased Forcount memberships with cash or crypto assets.  Investor funds were pooled together and all investors were entitled to (fictitious) profits.  Investors reasonably expected profits from their Forcount memberships based on the efforts of others.

18

Defendants touted Forcount's trading and mining operations would generate returns to all investors.

81.     No registration statement was ever filed or in effect for the offers and sales of the memberships, and no exemption from registration was available.

       **D.**     **FORCOUNT WAS A SHAM.**

82.     In reality, Forcount was a sham.  Forcount was a classic pyramid scheme. Forcount did not sell any real product or service to retail customers during the relevant time period, and had no apparent source of revenue other than funds received from investors.

83.     Despite what Defendants' told investors, Forcount had no or little investment in any crypto asset purportedly underlying the Forcount memberships.  Moreover, Forcount had no known automated crypto asset trading system or platform, and no known mining activity.

84.     Defendants falsely claimed that Forcount was "100% decentralized" where "all operations [were] performed through cryptocurrencies and their blockchains."  None of Forcount's operations, with the exception of MIC, were executed on any "blockchain," and Forcount's resources, data, and ownership were entirely under Da Silva's control.

85.     Forcount, at Da Silva's direction, recorded investors' principal (the initial investment amount) on the website platform for their membership, based on the amount of crypto assets associated with the membership.

86.     Investors could access Forcount's website, which had the false appearance of a crypto asset trading platform, and were able to access parts of the website that were made to look like account-specific web pages that contained investor-specific price, earnings, and commission data, based on what Defendants had promised that investor.  Those online accounts purportedly showed investors their daily returns from Forcount's trading and mining operations,

commissions, and points earned, which led investors to believe they were profiting from their investments and recruitment efforts.

87.     By accessing their accounts on the website, investors were led to believe that they were viewing the balance of a real account.  Investors did not know, however, that the balances, returns, commissions, and points were fabricated, and they had no ownership interest in any crypto asset reflected in their accounts on Forcount's website.

88.     Despite aggressively promoting Forcount as an income-generating opportunity, the huge profits that Defendants promised were not realized by investors, who served as the lower tiers of the Forcount pyramid scheme.  As with most such schemes, the wealth was concentrated primarily at the top of the pyramid, with Defendants benefiting at the expense of later investors.  And Defendants knew, or were reckless in not knowing, that as a pyramid scheme, Forcount was unsustainable.  Even Da Silva admitted this, filming himself bragging, "I'm the boss of the pyramid scammers, right?"

### E.     FORCOUNT'S COLLAPSE.

89.     As part of the fraudulent scheme, some investors were initially able to withdraw their fictitious "earnings" (though at no point could any investor withdraw any principal), when the scheme was growing, and new investors were investing in Forcount memberships.  Those new investors' funds paid the returns of earlier investors.  Often these early investors, believing it was a legitimate investment, encouraged friends and family to invest.

90.     For example, as noted above, Investor A monitored his investment on Forcount's website, and saw that he was receiving the expected returns that, in Investor A's case, Tacuri had promised.  Believing that Forcount's website was legitimate and that he had made an investment that was growing in value, Investor A encouraged four family members to invest as well.  But within a few months, Investor A and his family were unable to withdraw funds from Forcount.

20

91.     Even when investors could make withdrawals, Forcount's website only allowed an investor to withdraw a maximum of $500 to $1000, as well as charging a previously undisclosed withdrawal fee, which initially was 7%, but by late 2019 had grown to 35%. Forcount regularly restricted withdrawals throughout the scheme, and completely ceased permitting any withdrawals in late 2020.

92.     Some later investors invested by paying another investor directly to take control of that former investor's holdings.  Frequently, Forcount promoters, including Defendants, instructed investors to find those who wanted to liquidate their investments to sell to a new investor instead.  Through or at the direction of Da Silva, Forcount would then record the transaction and set up an account for the new investor on its website.

93.     Promotors also sold their parts of their own supposed holdings to investors.  By April 2018, Da Silva announced to the top promoters, including Tacuri, Perez, and Coronado, that they could no longer make withdrawals and that they had to sell what was reflected in their membership accounts to downline promoters or investors.  Perez, Tacuri, and Coronado thereafter began to simply pocket any new investor funds when selling parts of their own membership interests.

94.     Da Silva also caused fictitious crypto assets to be "deposited" into top promoters' accounts, including those of the other three Defendants, for the promotors to sell to new and downline investors.  Da Silva appears to have simply had the Forcount website reflect additional crypto assets in accounts of promoters as it suited him.  The amounts that Da Silva deposited would, if converted from the supposed crypto asset to fiat currency, have been worth tens or hundreds of thousands of dollars.  Perez, Tacuri, and Coronado knew, or were reckless in not knowing, that the crypto assets were fictitious.

95.     Despite knowing that Da Silva was depositing huge amounts of crypto assets into their accounts and despite knowing that they were pocketing new investor funds, Perez, Tacuri, and Coronado continued to coordinate with Da Silva to make supposed transfers from their accounts to the new investors appear as new memberships on Forcount's website.

96.     By the end of 2019, Promoter 1 noted to Da Silva, Tacuri, and Perez that Promoter 1 was receiving many complaints from their downline investors who were unable to make withdrawals.  Perez told Promoter 1 to take new investors to an upcoming Forcount event planned for January 2020.  Perez said that with the money raised from new investors, Da Silva could pay the earlier investors.

97.     Forcount  collapsed in or around November 2020, although Da Silva continued to promote Forcount into 2021.  Defendants raised, in total, more than $8.4 million from hundreds of investors in the United States misappropriating at least $3.4 million.

**F.     DEFENDANTS ENGAGED IN A FRADULENT, DECEPTIVE SCHEME DESIGNED TO MISLEAD INVESTORS AND DISSEMINATED MATERIAL MISREPRESENTATIONS TO OFFER AND SELL FORCOUNT MEMBERSHIPS.**

98.     Defendants knowingly or recklessly engaged in a fraudulent, deceptive scheme and made material misrepresentations in order to mislead and steal from Forcount investors.

99.     Da Silva was the architect of Forcount.  As discussed above, from approximately July 2017 through at least November 2020, he invented and promoted its fictional trading and mining operation.  Da Silva managed all the operations of Forcount including the creation of Forcount's publicly disseminated Business Plan and its website, which falsely reflected investor accounts that "held" crypto assets and returns from investments in Forcount memberships.  Da Silva also hired Individual 1 to pretend to be Forcount's CEO and presented another company's offices as Forcount's.

100.    From approximately October 2017 through 2019, Perez, Tacuri, and Coronado solicited investors and potential investors in Forcount memberships, repeating many false claims about Forcount and perpetrating the fraudulent scheme.  After Coronado left Forcount in or around January 2019, Perez and Tacuri continued to defraud investors and potential investors in Forcount memberships through in or around November 2020, partnering to host investor events throughout the United States.

101.    From the time they were associated with Forcount, Defendants made numerous false statements to investors and potential investors, including by sharing and parroting statements in the Business Plan and Forcount's website.  These false representations included that Forcount (1) sold a real product or service; (2) had sources of revenue other than funds collected from investors, (3) conducted "automated trade" through "calibrated robots" on behalf of investors, (4) had an "intelligent mining system"; (5) was "100% decentralized," (6) had a trading platform, (7) sold memberships that earned returns based on an underlying crypto asset.

102.    Defendants knew, or were reckless in not knowing, that the foregoing representations were false.  By mid to late 2018—at least around the time Da Silva announced that promoters could keep investors funds—Perez, Tacuri, and Coronado knew or were reckless in not knowing that Da Silva was not using investor proceeds to trade or mine crypto assets. Despite this, Defendants continued to make the same misrepresentations.

103.    Defendants Tacuri, Perez, and Coronado also did not achieve the success they claimed when speaking to investors and potential investors.  Perez, Tacuri, Coronado, and other top promoters, at Da Silva's direction, claimed that they had reached high levels within the Forcount pyramid like "Black Diamond" and "Executive Diamond."  They also claimed to have purchased luxury cars with their profits.  In truth, Tacuri, Perez, and Coronado had never brought

23

in that amount of investor funds per month, were not actually as successful as they claimed, and knew or were reckless in not knowing that such titles and claims were inaccurate.

104.    The foregoing misrepresentations were all material and led investors to invest in Forcount memberships, to keep their money with Forcount, and/or to re-invest their supposed returns, and to solicit new investors from their friends and family.

105.    Moreover, Defendants knew, or were reckless in not knowing, that Forcount was an illegal pyramid scheme.  Defendants knew, or were reckless in not knowing, that Forcount had no operations that could sustain promised returns to investors, and that Forcount could only sustain itself through an increase in incoming investor funds.  From the beginning of each Defendant's participation in Forcount, Defendants knew that the supposed crypto assets in investors' accounts had no value outside of Forcount's platform.  By April 2018, at the latest, Defendants knew or were reckless in not knowing that promoters, including Perez, Tacuri, and Coronado, were pocketing investor funds and selling interest in memberships based on entirely fictitious crypto assets that Da Silva had "deposited" in promoters' accounts.

106.    Despite knowing or recklessly disregarding the truth, Defendants each participated in developing and marketing a false image of Forcount through misrepresentations to investors and potential investors.

### G.    DEFENDANTS PROFITED FROM FORCOUNT.

107.    For the period of October 2017 through November 2020, Forcount investors invested over $8.4 million to invest in Forcount memberships.

108.    Each of the Defendants benefitted from Forcount's sales to investors.  Da Silva split some of the incoming funds with his top promoters, including Tacuri, Perez, and Coronado, reserving some percentage (at one point potentially 30%) to make Ponzi-type payments to downline promoters and investors.  Further, as discussed above, by April 2018, at Da Silva's

direction, Tacuri, Perez, and Coronado were simply selling the fictitious crypto asset balances in their Forcount accounts and pocketing the investors' funds.

109.    Through the above-described fraudulent scheme, Da Silva received significant investor funds, including cash deposits into several accounts in the United States that he controlled.  As the top of the pyramid, Da Silva earned greater returns than Perez, Tacuri, and Coronado.  At least $4.9 million in suspected investor funds were deposited in U.S. bank accounts that Da Silva controlled.

110.    In addition, Da Silva took videos showcasing his extravagant spending and assets during this time period, including, all in Brazil: two private jets, two helicopters, dozens of luxury vehicles, and a seaside mansion with a heliport, as well as, in Florida, another mansion. For example, in one video from May 2019, he sarcastically "thanked" Forcount investors—who had been told Forcount would contribute some portion of its profits to a charity—for contributing to a "charitable fund" that had allowed him to buy a Lamborghini.  (Translation, original in Portuguese.)

111.    Perez, Tacuri, and Coronado promoted Forcount in the United States.  After April 2018, Perez, Tacuri, and Coronado followed Da Silva's directive to sell their own "balances" and keep investor funds for themselves.  From October 2017 to January 2019, Perez and Coronado brought in approximately $2.5 million from investors.  Rather than use investors' funds to purchase the crypto asset underlying the membership as promised, they misappropriated approximately $1 million, which they split equally.

112.    Tacuri brought in at least $1.5 million from investors, and he misappropriated at least $1.35 million for personal expenses including his residence, car payments, and various luxury goods.

## FIRST CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and
### Rules 10b-5 Thereunder Against All Defendants

113.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 112.

114.    Defendants, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

115.    By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Section 10(b) [15 U.S.C. § 78j(b)] of the Exchange Act and Rules 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF

### Violations of Sections 17(a) of the Securities Act Against All Defendants

116.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 112.

117.    Defendants, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, knowingly, recklessly, or negligently: (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of untrue statements of

material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in transactions, practices or courses of business which operate or would operate as a fraud or deceit upon a purchaser.

118.    By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Sections 17(a) of the Securities Act [15 U.S.C. §§ 77q(a)].

## THIRD CLAIM FOR RELIEF

**Violations of Sections 5(a) and 5(c) of the Securities Act Against All Defendants**

119.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 112.

120.    Defendants directly or indirectly, singly or in concert, (i) made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement was in effect; (ii) for the purpose of sale or for delivery after sale, carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, securities as to which no registration statement was in effect; or (iii) made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy, through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

121.    By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final

Judgment:

### I.

Permanently enjoining Defendants and their agents, servants, employees and attorneys

and all persons in active concert or participation with any of them from violating, directly or

indirectly, Sections 5(a), 5(c), 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), and

77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5 thereunder

[17 C.F.R. § 240.10b-5];

### II.

Permanently enjoining Defendants from directly or indirectly, including, but not limited

to, through any entity owned or controlled by Defendants, offering, operating, or participating in

any marketing or sales program in which a participant is compensated or promised compensation

solely or primarily for inducing another person to become a participant in the program, or if such

induced person induces another to become a participant in the program;

### III.

Permanently enjoining Defendants from participating, directly or indirectly, in any

offering of any crypto asset security, provided, however, that such injunction shall not prevent

them from purchasing or selling crypto asset securities for their own personal accounts;

**IV.**

Ordering Defendants to disgorge all ill-gotten gains they received directly or indirectly, with prejudgment interest thereon, as a result of the alleged violations, pursuant to Section 21(d)(3), (5) and (7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), (5) and (7)];

**V.**

Ordering Defendants to pay civil monetary penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

**VI.**

Permanently prohibiting Defendants from serving as  officers or directors of any company that has a class of securities registered under Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports under Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)], pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)]; and

**VII.**

Granting any other and further relief this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission demands

trial by jury in this action issues so triable.


Dated:  New York, New York
December 14, 2022

/s/ Thomas P. Smith, Jr.
_____

Thomas P. Smith, Jr.
Co-Acting Regional Director
Hane L. Kim
Shannon Keyes*
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004-2616
(212) 336-1088 (Kim)
kimha@sec.gov

Attorneys for Plaintiff

*Pending admission *pro hac vice*.